UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ROBERT LEE WOODARD, | Case No:  C 09-3331 SBA |
| Plaintiff, | **ORDER DENYING RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND GRANTING MOTION FOR NEW TRIAL** |
| vs. | |
| CITY OF MENLO PARK, et al., | |
| Defendants. | Docket 181 |

Plaintiff Robert Lee Woodard ("Plaintiff") brings the instant civil rights action against City of Menlo Park Police Officer Ron Venzon ("Officer Venzon") under 42 U.S.C. § 1983 alleging that Officer Venzon used excessive force against him in violation of his Fourth Amendment rights.  A jury trial commenced on September 20, 2012 and concluded on September 26, 2012.  The jury returned a verdict in favor of Officer Venzon on September 26, 2012.  At trial, Plaintiff was represented by pro bono counsel, Kristen Hall of Paul Hastings LLP, and Officer Venzon was represented by Nicolas Flegel and John Flegel of Jorgenson, Siegel, McClure & Flegel, LLP.

The parties are presently before the Court on Plaintiff's renewed motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure or, in the alternative, motion for new trial under Rule 59(a) of the Federal Rules of Civil Procedure.  Dkt. 181.  Officer Venzon opposes the motions.  Dkt. 194.  Having read and considered the papers filed in connection with these matters and being fully informed, the Court hereby DENIES Plaintiff's renewed motion for judgment as a matter of law, and GRANTS Plaintiff's motion for a new trial, for the reasons stated below.  The Court, in its discretion, finds these matters suitable for resolution without oral argument.  See Fed.R.Civ.P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

# I.     BACKGROUND

## A.     Factual Summary

The parties are familiar with the facts of this case, which are summarized herein only to the extent they are relevant to the instant order.

### 1.     Plaintiff's Account of Events

On February 3, 2007, Plaintiff, an African-American, was arrested in East Palo Alto, California while walking home from his niece's house.  First Amended Complaint ("FAC") ¶¶ 11-12.  Due to a longstanding pre-existing injury, Plaintiff was visibly limping.  Pl.'s Trial Brief at 2, Dkt. 109.  In February 2007, Officer Venzon - who is six feet tall - was in his early 30's and weighed approximately 250 pounds, while Plaintiff, who is five feet six inches and suffers from medical and psychological ailments, was 54 years old and weighed approximately 150 pounds.  Id. at 1; see Trial Tr., Vl. 2 at 40:23-41-3; Trial Tr., Vl. 3 at 213:10-11.

At approximately 9:48 p.m., Officer Venzon and his partner, Officer Joseph Hinkston ("Officer Hinkston"), were on patrol in the East Palo Alto area.  Pl.'s Trial Brief at 1.  Officer Venzon and Officer Hinkston approached Plaintiff in an unmarked car while he was walking home and asked to speak with him.  FAC ¶ 12.  Plaintiff responded by asking Officer Venzon what he wanted, but Officer Venzon merely repeated his request to speak with him.  Pl.'s Trial Brief at 2.[1]  Plaintiff, apparently not realizing that Officer Venzon was a police officer, ignored Officer Venzon's command and kept walking because he "did not know who [Officer Venzon] was and [he] was scared."  FAC ¶ 12.  Thereafter, Officer Venzon exited his vehicle and told Plaintiff to stop as he ran towards him.  Id.  During his pursuit of Plaintiff, Officer Venzon fell to the ground.  Pl.'s Trial Brief at 2.  Shortly thereafter, Plaintiff realized that Officer Venzon was a police officer and surrendered to him by putting his hands in the air and facing him.  FAC ¶ 12.

---

[1] Plaintiff has a severe speech impediment associated with his disabilities, which makes it difficult for listeners to understand his words.  Pl.'s Trial Brief at 2.  According to Plaintiff, Officer Venzon could have easily perceived that he was suffering from a disability or other serious impairment after hearing him speak.  Id.

Despite the fact that he was facing Officer Venzon with his hands up, Officer Venzon tackled Plaintiff to the ground.  FAC ¶ 12; Pl.'s Trial Brief at 2.  Officer Venzon then kneed Plaintiff in the chest and back and kicked him in the face and side with such force that he fractured five of Plaintiff's ribs and collapsed one of his lungs.  FAC ¶¶ 11-12; Pl.'s Trial Brief at 2.[2]  While Plaintiff was on the ground, Officer Venzon handcuffed him with the assistance of Officer Hinkston.  Pl.'s Trial Brief at 2.  A subsequent search of Plaintiff's person revealed no weapons of any kind or any illegal substances or contraband.  Id. at 3.

After Plaintiff was immobilized, Officer Venzon cited Plaintiff for possession of drug paraphernalia due to his discovery of a cocaine base pipe that Plaintiff had dropped during the foot pursuit.  Pl.'s Trial Brief at 3.  Officer Venzon did not issue Plaintiff a citation for resisting arrest.  Id.  Officer Venzon released Plaintiff at the scene after issuing him a citation for drug paraphernalia.  Id.  Plaintiff then walked the short distance to his mother's home.  Id. at 3-4.  Officer Venzon did not offer to escort Plaintiff home or take him to a hospital.  Id. at 3.

Plaintiff was in severe pain as he walked the short distance to his mother's house, and the pain worsened after he arrived.  Pl.'s Trial Brief at 4.  The pain he felt in his chest prompted him to ask his brother to take him to the hospital.  Id.  Plaintiff was admitted to the emergency room at Stanford Hospital that evening and remained in the hospital for approximately three days.  Id.  His diagnosis was a collapsed lung and five fractured ribs.  Id.  The medical bills for Plaintiff's treatment totaled $25,206.45.  Id.

///

///

///

---

[2] According to Plaintiff, "the beating" may have been racially motivated and that he may have been a victim of racial profiling because, after he was arrested, Officer Venzon "said that he was going to make an example of [Plaintiff] and show the rest of the niggers around who's the boss."  FAC ¶ 12.

### 2. Officer Venzon's Account of Events

On February 3, 2007, at around 9:48 p.m., Officer Venzon was on duty and on patrol in East Palo Alto as part of the "Operation Safe Streets" task force. See Def.'s Trial Brief at 3, Dkt. 100. He was in full police uniform and was driving an unmarked police vehicle. Id. Officer Venzon was partnered with Officer Hinkston, who was riding in the passenger seat. Id.

While driving northbound on Bay Road in Menlo Park, Officer Venzon observed Plaintiff walking northbound on the west side of Bay Road. Def.'s Trial Brief at 3. Officer Venzon stopped his patrol vehicle approximately six to eight feet from Plaintiff. Id. As he was exiting the vehicle, Officer Venzon told Plaintiff that he was a police officer and that he wanted to speak with him. Id. Plaintiff continued to walk, but turned to acknowledge Officer Venzon and ask him what he wanted. Id. When Officer Venzon explained to Plaintiff that he was a police officer and that he wanted to talk with him, Officer Venzon noticed that Plaintiff had placed his left hand in his front pants pocket, removed an unknown object, and proceeded to "cup" his hands over the object in an attempt to conceal it. Id. Officer Venzon then witnessed Plaintiff drop the object to the ground as he continued to walk away from him. Id.

Officer Venzon walked over to the object and immediately recognized it to be a cocaine base pipe. Def.'s Trial Brief at 3. He then yelled at Plaintiff to stop. Id. at 4. Instead of stopping, Plaintiff started running. Id. Officer Venzon then pursued Plaintiff on foot. Id. He caught up with Plaintiff approximately twenty or thirty feet from where he observed Plaintiff drop the cocaine base pipe. Id. He wrapped both of his arms around the upper torso of Plaintiff's body and pulled him to the ground. Id. Both Officer Venzon and Plaintiff landed on the left sides of their bodies. Id.

Once on the ground, Plaintiff was handcuffed by Officer Venzon with the assistance of Officer Hinkston. Def.'s Trial Brief at 4. Thereafter, Plaintiff was issued a citation for violating California Health and Safety Code § 11364 (possession of narcotic paraphernalia) and released at the scene. Id. According to Officer Venzon, Plaintiff did not put his hands

up in the air or comply with his command to stop.  Id.  He further asserts that he did not knee Plaintiff in the chest or back, or kick him in the side or face.  Id.  Officer Venzon claims that Plaintiff did not complain of any injuries at the scene or appear to be injured. Id.  He also denies telling Plaintiff that he wanted to make an example of him or that he used any racially derogatory terms when speaking with Plaintiff.  Id.

### 3.    The Related Criminal Case

On February 20, 2007, the San Mateo District Attorney charged Plaintiff with a violation of Health and Safety Code § 11364, possession of narcotic paraphernalia, and a violation of California Penal Code § 148(a)(1), "[r]esisting, delaying or obstructing [an] officer."  See Dkt. 44.  On January 17, 2008, pursuant to a plea agreement, Plaintiff pled nolo contendere to the resisting arrest charge, and the narcotic paraphernalia charge was dismissed.  Id.

### B.    Pretrial Rulings

In anticipation of trial, Plaintiff filed seven motions in limine, Dkt. 114-119, 142, while Officer Venzon filed three motions in limine, Dkt. 113.  As relevant to this order, the Court granted without prejudice Plaintiff's motion in limine no. 3, which sought to exclude all evidence offered regarding prior testimony given by Plaintiff during a suppression hearing in a related criminal action and all testimony given by Plaintiff in his deposition in the instant action.  Plaintiff moved to exclude such evidence on the ground that much of the testimony is unintelligible and therefore unreliable.  See Pretrial Hearing Tr. at 57:20:25; 59:4-60-19; 61:12-62:4; 63:1-4; 65:2-8.

In granting Plaintiff's motion in limine no. 3, the Court noted that the judge presiding over the suppression hearing in the related criminal action stated on the record:

> The record should reflect that none of us are able to understand what Mr. Woodard is saying.  It's incomprehensible.  He's talking, but it's not intelligible to any of us.  Some of the words are, but a lot are not.  I think that is a fair statement from the record.  And the reporter is having a difficult time getting it down.

Pretrial Hearing Tr. at 59:11-17.

In reaching its decision on motion *in limine* no. 3, the Court explained that it did not have confidence that the suppression hearing transcript was an accurate reflection of what Plaintiff said, particularly given what the judge stated on the record, and because the Court has "had an almost impossible time" understanding Plaintiff when he has spoken in Court. Id. at 60:9-14; 62:10-63:4; 67:4-15.[3]  Based on reliability concerns, the Court granted Plaintiff's motion without prejudice to revisiting the motion with respect to specific statements that defense counsel believed were not contaminated by the reliability concerns articulated by the Court.  Id. at 67:17-68:5.  The Court stated that defense counsel is prohibited from using the suppression transcript or deposition transcript for impeachment purposes unless they first seek and obtain leave of Court to do so.  See id. 68:20-25.

In addition, the Court granted Plaintiff's motion *in limine* no. 5, which sought to exclude all evidence regarding Plaintiff's prior convictions and arrests, including evidence concerning the resolution of the related criminal case.[4]  Pretrial Hearing Tr. at 81:21-24.  In doing so, the Court noted that defense counsel indicated on the record that he does not intend to elicit any information regarding Plaintiff's prior convictions or arrests.  Id. at 82:20-23.  As part of the discussion concerning this issue, defense counsel stated that he wanted to explain to the jury that Plaintiff was "charged as part of this incident."  Id. 82:3-5.  In response, Plaintiff's counsel questioned why defense counsel "needs to introduce

---

[3] The Court noted that it is appropriate to impeach people with documents so long as those documents are reliable indications of what the person being impeached said.  Pretrial Hearing Tr. at 60:16-19.

[4] In his moving papers in support of motion *in limine* no. 5, Plaintiff sought to exclude all evidence of his prior arrests and convictions on the ground that they are irrelevant.  Dkt. 118.  In response, Officer Venzon agreed that Plaintiff's prior arrests and convictions are not directly relevant to the issues in this lawsuit.  Dkt. 123.  However, he argued that evidence regarding a plea deal in the related criminal matter and evidence that Plaintiff was caught with a crack pipe two weeks after the incident giving rise to this action is relevant for impeachment purposes and to establish why the district attorney's office dismissed the drug paraphernalia charge as part of a negotiated plea in which Plaintiff pled guilty to the charge of resisting arrest.  Dkt. 10.  In reply, Plaintiff argued that such evidence is irrelevant to whether Officer Venzon's  use of force was reasonable and therefore should be excluded.  Dkt. 136.  Plaintiff argued that the evidence does not have any probative value and, even if it did, the probative value of such evidence is substantially outweighed by its prejudicial effect.  Id.

evidence that there was a charge dropped." Id. 82:10-12.  Defense counsel explained that as part of the plea bargain in the related criminal case, Plaintiff pled to resisting arrest and the "crack pipe charge" was dropped because Plaintiff had actually "picked up another possession of crack pipe charge." Id. at 84:21-24.  In response to this exchange, the Court stated that this information cannot come into the record in front of the jury. Id. at 85:3-4. Ultimately, defense counsel agreed that they would not introduce evidence as to why the drug paraphernalia charge was dropped if Plaintiff agreed not to argue that Plaintiff was never charged with possession of drug paraphernalia. Id. at 85:17-21.

The Court also granted Plaintiff's motion *in limine* no. 6, which sought to exclude all evidence regarding Plaintiff's receipt of disability benefits.  Pretrial Hearing Tr. at 86:3-5. In support of this motion, Plaintiff specifically argued that the Court should exclude all evidence referencing his receipt of disability benefits, including his status as "a Medicare recipient" because any evidence relating to the source of payment for his medical bills lacks any probative value of damages, and its introduction could create undue prejudice to the determination of liability and damages as the jury may see Plaintiff as being "on the public dole." Dkt. 119.  Following defense counsel's representation that Officer Venzon does not contest this motion, the Court granted the motion.  See Pretrial Tr. at 87:2-20.  While defense counsel later suggested that the collateral source rule does not apply to payments received by Medicare recipients like Plaintiff, see id. at 120:5-10; 123:15-17; 147:3-4; 147:19-24, counsel failed to present any authority supporting their position.  See Trial Tr., Vl. 1 at 39:23-40:3.  In fact, defense counsel subsequently represented to the Court that the cases they found hold that the collateral source rule applies to Medicare cases, and that they assume it would also apply to Medi-Cal cases. Id. at 40:25-41-2.

Finally, the Court granted in part and denied in part Plaintiff's motion *in limine* no. 7, which sought to exclude certain opinions of Officer Venzon's rebuttal medical expert, Dr. Paul Joseph Mills, M.D. ("Dr. Mills").  Dkt. 169.  The Court ruled that while Dr. Mills may offer an opinion as to his diagnosis of Plaintiff's rib injuries, he is precluded from offering any opinion as to the cause of Plaintiff's injuries, including the cause of his rib

injuries.  Id.  As such, Dr. Mills was precluded from testifying that Plaintiff's injuries were caused by a "single event" and not from "multiple blows" as indicated in his expert report. Id.

### C.   Trial and Post-Trial

On September 20, 2012, a jury trial commenced.  At the close of evidence, Plaintiff moved for judgment as a matter of law under Rule 50(a) on the ground that the evidence presented to the jury was insufficient to support a verdict in favor of Officer Venzon on liability.  See Trial Tr., Vl. 5 at 128:9-12.  Specifically, Plaintiff argued that judgment as a matter of law was appropriate because the jury does not have a legally sufficient evidentiary basis to find for Officer Venzon on the issue of whether he failed to provide adequate post-arrest medical care.  See id. at 128:13-16; 131:4-8.  The Court denied Plaintiff's motion, stating that this case is not amendable to being resolved as a matter of law because liability turns on whose version of events the jury believes.  Id. at 132:19-25; 133:22-24.

On September 26, 2012, the jury returned a verdict in favor of Officer Venzon.  Dkt. 175.  Final judgment was entered on October 15, 2012.  Dkt. 177.  The parties are presently before the Court on Plaintiff's renewed motion for judgment as a matter of law under Rule 50(b) or, in the alternative, motion for new trial under Rule 59(a).  Dkt. 181.  Officer Venzon opposes the motions.  Dkt. 194.

## II.   LEGAL STADARD

### A.   Judgment as a Matter of Law

"A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.  The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed.R.Civ.P. 50(a).  "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."  Fed.R.Civ.P. 50(b).  After the entry of judgment, "the movant may file a renewed motion for judgment as a matter of law and may include an

alternative or joint request for a new trial under Rule 59."  Id.  In ruling on the motion, "the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."  Id.

It is well settled that any arguments raised in a post-trial Rule 50(b) motion for judgment as matter of law must first have been presented in a pre-verdict Rule 50(a) motion.  E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009).  Consequently, a Rule 50(b) motion "is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion."  Id.

In the Ninth Circuit, a motion for judgment as a matter of law pursuant to Rule 50(b) is appropriate when the evidence permits only one reasonable conclusion, and that conclusion is contrary to that of the jury.  Martin v. Cal. Dep't of Veterans Affairs, 560 F.3d 1042, 1046 (9th Cir. 2009); Josephs v. Pacific Bell, 443 F.3d 1050, 1062 (9th Cir. 2006).  All evidence must be viewed in the light most favorable to the nonmoving party, and the court must draw all reasonable inferences in that party's favor.  Go Daddy Software, 581 F.3d at 961.  "[I]n entertaining a motion for judgment as a matter of law, the court . . . may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  A jury verdict "must be upheld if it is supported by substantial evidence . . . even if it is also possible to draw a contrary conclusion."  Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002).  The standard for judgment as a matter of law is "very high"; a jury's verdict can only be overturned if "there is no legally sufficient basis for a reasonable jury to find for that party on that issue."  Costa v. Desert Palace, Inc., 299 F.3d 838, 859 (9th Cir. 2002) (quotation marks omitted).

### B.    New Trial

Under Federal Rule of Civil Procedure 59, a district court has the discretion to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed.R.Civ.P. 59(a)(1)(A).  Because "Rule 59 does not specify the grounds on which a motion for a new trial may be granted," courts are "bound by those grounds that have been historically recognized."  Zhang v. Am. Gem Seafoods, Inc., 339

F.3d 1020, 1035 (9th Cir. 2003).  Cognizable grounds for a new trial include (1) a verdict that is contrary to the weight of the evidence, (2) a verdict that is based on false or perjurious evidence, or (3) to prevent a miscarriage of justice.  Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007).  A new trial may be granted based on attorney misconduct, if the "flavor" of the misconduct sufficiently permeated the entire proceeding " 'to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.' "  Kehr v. Smith Barney, Harris Upham & Co., Inc., 736 F.2d 1283, 1286 (9th Cir. 1984).   The decision as to whether to grant a new trial motion lies within the discretion of the district court.  See Merrick v. Paul Revere Life Ins. Co., 500 F.3d 1007, 1013 (9th Cir. 2007).

**III.   DISCUSSION**

    **A.    Renewed Motion for Judgment as a Matter of Law**

    Plaintiff moves for judgment as a matter of law on liability and a new trial on the issue of damages.  See Pl.'s Mtn.  Plaintiff contends that judgment as a matter of law is appropriate because the undisputed evidence supports only one reasonable conclusion: Officer Venzon violated Plaintiff's Fourth Amendment rights by failing to provide adequate post-arrest care.  Id. at 3-5.  Plaintiff argues that it is undisputed that Officer Venzon did not summon an ambulance for him or take him to the hospital after his arrest despite his "extensive injuries," including five fractured ribs and a punctured lung.[5]  Id. at 5. According to Plaintiff, no reasonable jury could have concluded that Officer Venzon did not violate his Fourth Amendment rights because Officer Venzon admitted that Plaintiff was injured in the course of being apprehended and that he did not call an ambulance or transport Plaintiff to a hospital.  Id. at 5.

    The Ninth Circuit analyzes claims regarding deficient medical care for an arrested suspect under the Fourth Amendment.  See Tatum v. City and County of San Francisco,

---

[5] To the extent that Plaintiff states that he suffered a punctured lung, the Court notes that the evidence in the record shows that Plaintiff suffered from a collapsed lung, not a punctured lung.  Trial Tr., Vl. 2 at 231:9-232:6.

441 F.3d 1090, 1098-1099 (9th Cir. 2006).  The Fourth Amendment requires law enforcement officers to provide objectively reasonable post-arrest care to an apprehended individual.  Id. at 1099.  Although the Ninth Circuit has not articulated the precise contours of what constitutes objectively reasonable post-arrest care, it has held that "a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment."  Id. at 1099.  It has also held that "the Fourth Amendment does not require a police officer to . . . provide what hindsight reveals to be the most effective medical care for an arrested suspect."  Id. at 1098.

Viewing the evidence in the light most favorable to Officer Venzon and drawing all reasonable inferences in his favor, the Court finds that there is a sufficient evidentiary basis for a reasonable jury to conclude that Officer Venzon did not violate Plaintiff's Fourth Amendment rights by failing to summon medical assistance for him or transport him to a hospital after he was arrested.  There is substantial evidence in the record to support the conclusion that Officer Venzon's actions in responding to the post-arrest medical needs of Plaintiff were not objectively unreasonable.

Officer Venzon testified that Plaintiff did not complain of any injury, and that he did not observe any visible signs of injury, distress, or labored breathing after Plaintiff was arrested.  Trial Tr., Vl. 5 at 8:12-9:9; 32:13-33:17.  Officer Venzon further testified that it did not appear at any point that Plaintiff needed to go to the hospital, and that, if Plaintiff had appeared injured or complained of injury, he would have transported Plaintiff to a nearby hospital or summoned medical care because it is a "policy" and his "normal practice" to do so.  Trial Tr., Vl. 3 at 237:2-18.

Officer Hinkston corroborated Officer Venzon's testimony.  He testified that "it didn't seem like [Plaintiff] was in any pain," and that Plaintiff did not give any indication that he was in pain.  Trial Tr., Vl. 3 at 180:4- 10.  Officer Hinkston further testified that Officer Venzon asked Plaintiff if he was injured and Plaintiff responded with a head gesture indicating that he was "okay."  Id. at 180:11-17.  Officer Hinkston also testified that he

1  would have "called for medical" if it appeared that Plaintiff was injured or if he knew

2  Plaintiff was injured because it is "policy" to do so.  Id. at 183:13-19.

3      In addition to the testimony of the officers, the evidence in the record shows that,

4  when Plaintiff arrived at the hospital a few hours after his arrest, his priority for admission

5  was a three out of four - indicating that his need to be seen was not as high as an individual

6  considered a one or two priority, his oxygen saturation level was 100%, his pain level was a

7  four out of ten, his respiration was not labored, his lungs were clear, he was alert, he had no

8  cardiovascular problems, he had no abrasions on his skin, and he had a full range of motion

9  (i.e., he was moving in a normal fashion).  Trial Tr., Vl. 2 at 223:15-224:8; 226:18-227-

10  228:2; Trial Tr., Vl. 3 at 144:10-14; 145:11-23; 146:7-21.  The evidence also shows that X-

11  rays were taken and Plaintiff was sent home.  Trial Tr., Vl. 2 at 66:8-11; 228:3-4.[6]

12  Plaintiff's medical expert, Dr. Fullerton, testified that, other than the collapsed lung and the

13  cracked ribs, the medical records did not indicate that Plaintiff suffered any other injuries.

14  Id. at 232:3-13.

15      In support of his position that no reasonable jury could have concluded that Officer

16  Venzon provided adequate post-arrest care, Plaintiff's motion papers rely solely on the

17  testimony of Officer Venzon.  Pl.'s Mtn. at 5.  Specifically, Plaintiff notes that Officer

18  Venzon admitted at trial to knowing that Plaintiff was treated for five fractured ribs and a

19  punctured lung following Plaintiff's arrest, that he conceded that he *could* have caused

20  those injuries, and that he admitted that he was "not surprised" to find out that Plaintiff was

21  injured from "being tackled."  Id. (emphasis added); see Trial Tr., Vl. 5 at 33:4-34:5; Trial

22  Tr., Vl. 3 at 236:21-25.  In his reply brief, Plaintiff states that Officer Venzon's "incredible

23  claim" that he did not know Plaintiff was injured is contradicted by the testimony of Dr.

24  Fullerton, who opined that, given the "degree of rib fracture or fractures and that secondary

25  traumatic pneumothorax," Officer Venzon "would have or should have recognized that

26
    _____
27      [6] Plaintiff returned to the hospital after his X-rays were reviewed by a doctor.  Trial
    Tr., Vl. 2 at 66:12-16; 228:5-7.  Plaintiff testified that he was called by a doctor who told
28  him that he needed to return to the hospital immediately because he might die.  Id. at 66:15-
    21.

there was . . . a significant injury . . . requiring medical attention."  <u>See</u> Pl.'s Reply at 5; Trial Tr., Vl. 2 at 168:9-20.  Plaintiff asserts that Dr. Fullerton's medical opinion is supported by Plaintiff's testimony in which he stated that he was "wheezing" or "panting" following his arrest due to his inability to draw a full breath.  Pl.'s Reply at 5; <u>see</u> Trial Tr., Vl. 2 at 53:11-54:5.  Finally, the Court's independent review of the record reveals that Plaintiff testified that he told Officer Venzon that he needed to be taken to a doctor shortly after he was arrested, <u>id.</u> at 52:11-53:8, and that he asked the officers to call an ambulance for him after he was issued a citation for possession of drug paraphernalia, <u>see id.</u> at 61:3-6.

While the Court recognizes that there is evidence in the record demonstrating that it was possible for the jury to draw a contrary conclusion regarding the reasonableness of Officer Venzon's post-arrest care, judgment as a matter of law is appropriate when the evidence permits *only* one reasonable conclusion which is contrary to that of the jury.  The evidence in the record does not permit such a conclusion.  This is not the type of case in which medical assistance was so obviously needed that is was objectively unreasonable for Officer Venzon not to summon medical care for Plaintiff or to transport him to the hospital.  The evidence presented does not support the conclusion that no reasonable jury could find for Officer Venzon on the reasonableness of his post-arrest care.  Accordingly, because the "very high" standard for judgment as a matter of law has not been met, Plaintiff's renewed motion for judgment as a matter of law is DENIED.

**B.    Motion for a New Trial**

In the alternative to his motion for judgment as a matter of law, Plaintiff moves for a new trial on the issues of liability and damages based on defense counsel's misconduct.  Pl.'s Mtn. at 11-22.  Plaintiff argues that a new trial is warranted because defense counsel's pervasive misconduct prejudiced the jury, resulting in a verdict against the clear weight of the evidence.  <u>Id.</u> at 2, 9.  In addition, Plaintiff moves for a new trial on the ground that the clear weight of the evidence establishes liability under § 1983, i.e., a new trial is warranted because the jury verdict is contrary to the weight of the evidence.  <u>Id.</u> at 9-11.

///

1

### 1.      Misconduct of Defense Counsel

Attorney misconduct during the course of trial may warrant a new trial where such conduct "substantially interfered with the moving party's interest."  See S.E.C. v. Jasper, 678 F.3d 1116, 1129 (9th Cir. 2012) (internal quotation marks omitted).  "[T]he flavor of the misconduct must sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict."  Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1270 (9th Cir. 2000) (internal quotation marks omitted); see Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 346 (9th Cir. 1995) ("Where misconduct permeates the proceeding, the jury is 'necessarily prejudiced.' ").  Constant objections are unnecessary in that they "could antagonize the jury."  Anheuser–Busch, 69 F.3d at 346.

In evaluating the likelihood of prejudice from the improper remarks of counsel, the Court "should consider 'the totality of circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself.' "  Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1193 (9th Cir. 2002).  "[W]hen the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict, a new trial should be granted."  Pappas v. Middle Earth Condominium Assn., 963 F.2d 534, 540 (2d Cir. 1992).

The grant of a new trial is "confided almost entirely to the exercise of discretion on the part of the trial court."  Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980).  The trial court's decision, therefore, will not be reversed absent a showing of abuse of discretion.  Murphy v. City of Long Beach, 914 F.2d 183, 186 (9th Cir. 1990).  A district court's granting of a new trial will be upheld if "any of the district court's grounds are reasonable."  Silver Sage Partners v. City of Desert Hot Springs, 251 F.3d 814, 819 (9th Cir. 2001) (quotation marks omitted).  A district court's ruling will not be disturbed unless the Ninth Circuit has a "definite and firm conviction that the court committed a clear error

of judgment in the conclusion it reached."  Anheuser–Busch, 69 F.3d at 346 (quotation marks omitted).

Plaintiff contends that a new trial is warranted because the pervasive misconduct of defense counsel prejudiced the proceedings.  Pl.'s Mtn. at 11-22.  Specifically, Plaintiff argues that defense counsel knowingly violated the Court's orders and introduced inadmissible evidence, made improper testimonials as to their own opinions, experiences, and credibility, introduced improper legal instruction, and made improper appeals to the passion, prejudice and sympathy of the jury.  Id.

In support of his motion for a new trial based on attorney misconduct, Plaintiff notes that the Court made the following statement on the record after the jury returned its verdict and was dismissed:

> I will say at this point that I have serious concerns with respect to the manner in which this case was presented to the jury.  There have been numerous instances at trial where defense counsel have violated the orders of this Court in both letter and spirit.  And I cannot say at this juncture that those transgressions were not unduly prejudicial or harmless.

> The Ninth Circuit case law is clear that -- that the Court has the authority to *sua sponte* grant a new trial to prevent a miscarriage of justice.  And it is settled in the Ninth Circuit that a new trial is appropriate based on the prejudicial effect of attorney misconduct.

> As I have made clear throughout the trial, I am absolutely appalled at the manner in which defense counsel have comported themselves in this case.  The violations of the Court's orders, including its *in limine* rulings, began with Defendant's opening statement, continued during the presentation of testimony, and even occurred during closing statement.

> I previously stated that I am seriously considering holding defense counsel in contempt for what I have found to be a willful violation of the Court's order to exclude witnesses from this courtroom.  That continues to be a consideration as well as the possibility of granting a new trial.

Trial Tr., Vl. 5, at 240:8-241:6.

///

///

///

///

a.      **Violations of Court Orders Prior to Closing Argument**

i.      **Opening Statements**

Plaintiff contends that defense counsel introduced inadmissible evidence during opening statements concerning Plaintiff's prior arrests and convictions in violation of a Court order.  Pl.'s Mtn. at 12.  During Officer Venzon's opening statement, defense counsel provided an overview of the case and what he thought the evidence would show.  After discussing the incident giving rise to the instant action, he stated: "Now, you should know after the incident, [Plaintiff] was charged by the district attorney with both resisting arrest and possession of narcotic paraphernalia.  [Plaintiff] pled no contest to the charge of resisting arrest.  The drug paraphernalia charge was dropped as part of the plea deal."  Trial Tr., Vl. 1 at 36:21-25.

On the following morning, out of the presence of the jury, the Court informed defense counsel that he had directly violated a Court order by making this statement.  In doing so, the Court reminded defense counsel that there was an extensive discussion regarding this issue during which defense counsel agreed not to introduce evidence as to why the possession of the cocaine base pipe charge was dropped.  See Trial Tr., Vl. 2 at 3:14-9:15.  During this discussion, the Court stated that the purpose of opening statements is to convey what the evidence will show, and that because defense counsel was prohibited from introducing evidence as to why the charges were dropped, he should not have made the statement.  Id. at 5:2-6:1.  In response, defense counsel claimed that he "misunderstood the order."  Id. at 6:2-3.  The Court admonished defense counsel that it is "really important" to follow the Court's rulings because otherwise it creates problems for the record and for the jury.  Id. at 9:4-9.  The Court also noted that the statement was prejudicial.  Id. at 9:10-15.

In the presence of the jury, the Court stated that opening statements are not evidence and that the purpose of opening statements is to explain what the evidence will show.  Trial Tr., Vl. 2 at 23:6-13.  The Court then told the jury that defense counsel made a statement that the evidence would show Plaintiff was charged with a drug paraphernalia charge that

1  was dropped as part of a plea agreement, which is not true as the evidence would not show

2  that.  Id. at 23:14-19.  The Court also instructed the jury to disregard that part of defense

3  counsel's opening statement because no such evidence to that effect will be offered at trial.

4  Id. at 23:19-24.

5       The Court finds that defense counsel's remarks during his opening statement were

6  inappropriate, deliberate, and constitute misconduct.  Counsel's remarks violated a Court

7  order and were prejudicial.  Plaintiff's motion in *limine no*. 5 sought to exclude all evidence

8  of prior arrests and convictions, including evidence regarding the resolution of the related

9  criminal matter.  Dkt. 118, 136.  At the pretrial hearing, defense counsel agreed that he

10  would not seek to offer argument or evidence regarding Plaintiff's prior arrests or

11  convictions.  Defense counsel also agreed that he would not offer argument or evidence as

12  to why the drug paraphernalia charge was dropped.  However, he failed to comply with the

13  Court's order on Plaintiff's motion *in limine* no. 5 and his agreement not to discuss the

14  reason the drug paraphernalia charge was dropped.

15       Defense counsel's misconduct was prejudicial because the resolution of the criminal

16  charges against Plaintiff is irrelevant to the issue to be decided by the jury; namely, whether

17  Officer Venzon used excessive force in violation of Plaintiff's Fourth Amendment rights.

18  See Graham v. Connor, 490 U.S. 386, 396-397 (1989).  Counsel's remarks suggested to the

19  jury that the post-arrest decision by the district attorney's office to charge Plaintiff with

20  resisting arrest and possession of drug paraphernalia were somehow relevant to the

21  excessive force inquiry.  The remarks also might have suggested to the jury that Plaintiff's

22  arrest was lawful given that he pled no contest to the resisting arrest charge.  As such,

23  defense counsel's remarks during his opening statement as to why the drug paraphernalia

24  charge was dropped were prejudicial because they mislead the jury and confused the issues.

25            **ii.      Cross-Examination of Plaintiff**

26       Plaintiff contends that defense counsel improperly introduced Plaintiff's deposition

27  testimony in violation of a Court order.  Pl.'s Mtn. at 13.  At the pretrial conference, the

28  Court and the parties engaged in a lengthy discussion regarding Plaintiff's motion *in limine*

no. 3, which sought to exclude all evidence regarding prior testimony given by Plaintiff during a suppression hearing in the related criminal matter and all evidence offered regarding Plaintiff's deposition testimony in the instant action.  <u>See</u> Pretrial Tr. at 57:20-68:25.  Plaintiff argued that this evidence should be inadmissible for impeachment purposes because it is incomplete and unreliable due to Plaintiff's documented and recognized difficulties with oral communication.  Dkt. 116.

As discussed above, based on reliability concerns regarding the accuracy of Plaintiff's prior testimony, the Court granted Plaintiff's motion *in limine* no. 3 without prejudice to revisiting the motion with respect to specific statements that defense counsel believed were not contaminated by the reliability concerns articulated by the Court.  Pretrial Hearing Tr. at 67:17-68:5.  The Court specifically told defense counsel that they are not to use the suppression transcript or Plaintiff's deposition transcript for impeachment purposes without first asking and obtaining leave of Court to do so.  <u>See id.</u> at 68:20-25.

Notwithstanding the Court's unambiguous ruling, defense counsel violated the Court's order at trial.  During his cross-examination of Plaintiff, defense counsel questioned Plaintiff regarding the incident giving rise to the instant action.  At one point, he referenced the fact that Plaintiff had sat for a deposition and then began to ask a question based on what Plaintiff had said during his deposition.  Trial Tr., Vl. 2 at 116:23-117-8.  Before defense counsel could finish his question, the following exchange occurred:

> **Ms. Hall:**  Your honor, I would just caution that this might go into one of the subjects of the motions *in limine* which requires special authorization before we can admit testimony.
>
> **The Court:**  Well, that's not really an objection.  But I just assume counsel - - all counsel are cognizant of the rulings the court has made - - and are adhering to them.
>
> **Mr. J. Flegel:**  Okay.
>
> **Ms. Hall:**  I believe that motion was granted, though, without prejudice to them seeking specific portions of the testimony.
>
> **The Court:**  All right.  That imposes an obligation on the party who wishes to - - to have a different ruling to - - to seek leave of the court.  Otherwise, the ruling stands.

**Ms. Hall:**  And I believe he's - - correct me if I'm wrong - - I believe he's going to read into  - - refer to testimony given during that deposition?

**The Court:**  Is that correct?

**Mr. J. Flegel:**  No.

**The Court:**  No?
Okay.  Well, if you - - seem like you're anticipating something that may not materialize.  If it materializes, obviously, you can object.  And if it doesn't, then you will not need to.  But as I said, I expect counsel to respect the rulings that have been made and to - - to their detriment if not.

So proceed.

Id. at 117:9-118:12

Shortly after this exchange, defense counsel asked Plaintiff, without first obtaining leave of court: "Didn't you also testify at one point in your deposition that someone shot at you with a gun?"  Trial Tr., Vl. 2 at 119:12-13.  Following an objection by Plaintiff's counsel, the Court held a sidebar on the record wherein the Court explained to defense counsel that he had violated the Court's ruling on Plaintiff's motion *in limine* no. 3 by failing to request and obtain leave of Court before using Plaintiff's deposition testimony to impeach him.  See id. at 119:18-120:19.  In response, defense counsel stated: "I thought we could read the testimony in."  Id. at 120:11.  The Court informed defense counsel that he was wrong, stating that the "whole purpose of the ruling was that you can't impeach someone with something that's not reliable . . . we don't know whether he said it."  Id. at 120:13-17.  The Court went on to note that: "We have had extensive discussions, exhaustive discussions, and you keep telling me you [don't] understand."  Id. at 121:17-18.

The Court finds that defense counsel's inexplicable violation of a Court order was prejudicial to Plaintiff.  This is especially true given that the resolution of this case largely hinges on the credibility of witnesses.  By attempting to impeach Plaintiff with evidence that the Court determined is unreliable and inadmissible absent leave of Court, defense counsel deliberately engaged in misconduct that prejudiced Plaintiff.  The Court is unpersuaded by Officer Venzon's contention that Plaintiff was not prejudiced because there is other testimony in the record that calls into question Plaintiff's credibility.  The fact that

there may be other evidence in the record bearing on Plaintiff's credibility does not speak to whether defense counsel prejudiced Plaintiff by introducing impeachment evidence that the Court determined is unreliable and inadmissible.

### iii.   Exclusion of Witnesses From the Courtroom

In addition to violating the Court orders discussed above, defense counsel purposefully violated the Court's order excluding all witnesses from the courtroom.  On the first day of trial, the Court granted Plaintiff's motion to exclude witnesses, stating that "all persons who may be called as witnesses to testify during these proceedings will remain outside the courtroom until they have testified and are excused."  The parties were ordered to take responsibility for ensuring that their witnesses were advised of the Court's order. Trial Tr., Vl. 1 at 47:16-48:9.  On the last day of trial, Defendant's expert in police procedures, tactics and use of force, Sergeant James Katapodis ("Sergeant Katapodis"), testified.   Following his testimony, the Court asked him whether he had listened to the entire testimony of Officer Venzon.  Trial Tr., Vl. 5 at 120:24-121:1-2.  After he responded that he had, the Court asked Sergeant Katapodis whether he had been advised of the witness exclusion order and he replied: "absolutely not."  Id. at 121:3-9.  In fact, Sergeant Katapodis stated that he specifically asked defense counsel if he could sit in the courtroom and was told that he could.  Id. 121:11-14.

Out of the presence of the jury, the Court engaged in a discussion with the parties regarding defense counsel's deliberate violation of the Court's witness exclusion order, explaining that the obvious purpose of the order was to ensure that a witness' testimony is his or her own and not influenced by the testimony of other witnesses that have testified before them.  Trial Tr., Vl. 5 at 123:21-124:7.  The Court went on to state as follows:

> Here, this expert sat through the Defendant's entire testimony.  His testimony was clearly tailored in response to what he heard.  Sometimes even specific enough to say the same thing the Defendant said.  What comes immediately to mind is the running in front of him and the weapons.  I am fairly confident but for the fact that he heard the Defendant say that, his testimony would have probably not at least mimicked it.
>
> So it's clear to me that the expert's testimony in this case has been influenced by and tailored to what he heard.  The violation of this Court's order is prejudicial . . . to the Plaintiff . . . unless we remedy it in some way.

- 20 -

So, those are my concerns.  And I have serious concerns with the Defendant's counsels' violations of this Court's Order.  Every time we have a violation I'm told that you don't remember the Court's Order, or nobody objected to the Court's Order, or nobody objected to the transgression of the Court's Order.

I have not had any attorneys in my Court whose recollection is as dismal as the two of you based upon what you are telling me in connection with every violation.  And it concerns me.  And as I told you at sidebar, whether counsel objected to the presence of this expert or not is not of any consequence.  It doesn't matter to me whether any of you agree or object to any order I issue. The only thing that matters to me is that you comply with what I say. Because that's what's important.

I am considering contempt sanctions and I am also wanting to entertain any input you all have in terms of what limiting instruction I should give to this jury because the jury should know that.  And this is just, it's incredible to me.

But I want to make sure that you understand how serious this is because this is getting increasingly repetitive with the two of you.  And in the 22 years, 21 years I have been on this bench, I have not ever had lawyers repeatedly tell me what you are telling me, that you don't remember.  We just had a pretrial conference a week ago and you don't have a recollection of anything.

But this one is - - the witness said he specifically asked if he could sit through this witness' testimony, and he was told he could; strictly in contravention to this Court's Order.

And so at some point after we finish with this matter we are going to have a discussion about the propriety of contempt sanctions.

But in the meantime I'm entertaining a limiting instruction . . . because you all are going to be arguing, and once you finish arguing, I am going to instruct the jury.

. . . At this point, that's basically the only option because the [other] option would have been precluding the witness from testifying . . . but he was testifying at the time I brought that to your attention so I couldn't preclude him from testifying. . . .

Id. at 124:8-126:6.[7]

In response, defense counsel stated that both of Plaintiff's experts sat in while Plaintiff testified.  Trial Tr., Vl. 5 at 127:14-16.  Plaintiff's counsel, however, could not recall if her experts were present in the courtroom when Plaintiff testified.  Id. at 126:23-127:4.  Plaintiff's counsel later stated that she believed she saw Mr. Clark, Plaintiff's police

---

[7] The Court informed the parties during Plaintiff's cross-examination of Sergeant Katapodis that Sergeant Katapodis had sat through the entire testimony of Officer Venzon. Trial Tr.,Vl. 5. at 98:22-99:19.

practices expert, during Plaintiff's testimony, <u>id.</u> at 135:8-9,[8] and that she could not say in good faith that both of her experts did not sit through Plaintiff's testimony.  <u>Id.</u> at 140:4-7.

In light of the violation of the Court's sequestration order, the Court drafted a proposed limiting instruction.  <u>Id.</u> at 135:10-13.  After an extensive discussion and an agreement by the parties to modify the proposed instruction,[9] the parties agreed that they did not want the limiting instruction.  <u>Id.</u> at 146:17-23.  As such, the instruction was not given.  <u>Id.</u> at 146:24.

Federal Rule of Evidence 615 ("Rule 615") governs the exclusion of witnesses from the courtroom:  "At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony."  Fed.R.Evid. 615.  "The purpose of the rule is to prevent witnesses from "tailoring" their testimony to that of earlier witnesses and to aid in detecting testimony that is less than candid."  <u>United States v. Ell</u>, 718 F.2d 291, 292 (9th Cir. 1983) (citing <u>Geders v. United States</u>, 425 U.S. 80, 87 (1976)).  "The efficacy of excluding or sequestering witnesses has long been recognized as a means of discouraging and exposing fabrication, inaccuracy, and collusion."  Fed.R.Evid. 615, Adv. Comm. Notes 1972.

"It is the law of this circuit that 'when a court fails to comply with Rule 615, prejudice is presumed and reversal is required unless it is manifestly clear from the record that the error was harmless or unless the prosecution proves harmless error by a preponderance of the evidence.' "  <u>United States v. Brewer</u>, 947 F.2d 404, 411 (9th Cir. 1991).   In <u>Brewer</u>, the trial court refused to exclude one of the officers from the courtroom while the other officer testified.  The Ninth Circuit held that the Government failed to rebut the presumption of prejudice and that failure to exclude the officer was reversible error

---

[8] Defense counsel later represented to the Court that a Sergeant from the police department who had sat through the entire trial would testify that both the Plaintiff's experts were present during Plaintiff's testimony.  Trial Tr., Vl. 5 at 139:6-9.  Even assuming this is true, it is irrelevant to whether defense counsel willfully violated a Court order resulting in prejudice to the Plaintiff.

[9] <u>See</u> Trial Tr., Vl. 5 at 143:12-144:17

"[b]ecause the officers' testimony overlapped completely concerning critical testimony. . . ." Id.

After reviewing the record, the Court is convinced that defense counsel's willful violation of the sequestration order prejudiced Plaintiff.  The fact that Plaintiff's experts may also have been present in the courtroom in violation of the Court's sequestration order does not alter the fact that had a specific discussion with counsel, the willfulness of the violation, and more importantly that Plaintiff was prejudiced by defense counsel's violation of the order.  As discussed above, Defendant's police procedures, tactics and use of force expert, Sergeant Katapodis, sat through Officer Venzon's entire testimony in direct contravention of the sequestration order.  Sergeant Katapodis did so after specifically asking, and astonishingly receiving, permission from defense counsel to sit through the proceedings.  At set forth above, the expert's testimony was clearly tailored in response to what he heard.  At times, the testimony was so specific that Sergeant Katapodis seemed to "parrot" the testimony of Officer Venzon.  The Court is fairly confident that, but for the fact that the expert heard Officer Venzon testify, his testimony probably would not have mimicked Officer Venzon's testimony.

A review of the testimony of Officer Venzon and Sergeant Katapodis confirms the Court's determination at trial that defense counsel's willful violation of the sequestration order resulted in the tailoring of Sergeant Katapodis' testimony to that of Officer Venzon.  At the very least, the testimony indicates that Sergeant Katapodis was influenced by the testimony of Officer Venzon.  The record reveals an overlap of critical testimony, which indicates that Sergeant Katapodis' testimony mimicked Officer Venzon's testimony.

For example, Officer Venzon testified that he executed a "takedown" of Plaintiff whereby he wrapped his arms around the upper portion of Plaintiff's arms to incapacitate Plaintiff's arms for his safety and the safety of others.  Trial Tr., Vl. 3 at 227:2-12.  He also testified that he had no other options to capture Plaintiff.  Id. at 228:22-24; Trial Tr., Vl. 5. at 9:12-24.  Specifically, he testified that he could not have run in front of Plaintiff and cut him off or grabbed his arm, and that he executed a takedown for the purpose of gaining

control of Plaintiff's arms.  Trial Tr., Vl. 5 at 10:2-14.  With respect to the proper use of force under the circumstances - given the height and weight disparity between himself and Plaintiff - Officer Venzon testified that this factor is something to consider when taking someone into custody, but it does not negate the fact that he needs to control a person's arms because a smaller person (such as Plaintiff) can very well pull out a firearm or a knife and shoot or stab him.  Id. at 41:11-42:6.

Thereafter, Sergeant Katapodis testified that Officer Venzon's use of force in taking Plaintiff to the ground was appropriate and reasonable, and that any officer under the same circumstances would have done the same thing.  Trial Tr., Vl. 5 at 62:7-14.  More specifically, he testified that it was reasonable for Officer Venzon to take Plaintiff to the ground and to control both his hands because if Plaintiff had a weapon he would not be able to use it.  Id. at 68:21-65:9.  Sergeant Katapodis further testified that officers are not taught to run in front of a person because if an officer runs in front of a person it is much easier for that person to run towards the officer and stab and/or shoot them.  Id. at 65:23-66:11.  He stated that he teaches officers to run and grab from behind and never to run in front because officers will get shot in the back if they run in front of a person.  Id. at 66:9-11.  He also stated that the size disparity between Officer Venzon and Plaintiff "doesn't come into play" because police officers are going to "tackle him anyway" as he could be armed, have a martial arts background, or be a stronger individual.  Id. at 79:7-16.[10]

While this case does not involve the failure of the Court to exclude witnesses pursuant to a proper request under Rule 615, the Court finds that defense counsel's willful violation of the Court's sequestration order has the same prejudicial effect as if this Court had failed to grant such a request and allowed Sergeant Katapodis to observe the testimony of Officer Venzon.  Because it is clear to the Court that Sergeant Katapodis tailored his

---

[10] The Court notes that there are other similarities in the testimony.  For instance, contrary to the testimony of Plaintiff's police practices expert, Trial Tr., Vl. 2 at 247:9-249:10; 250:20-251:3, both Officer Venzon and Sergeant Katapodis testified that the use of a "firm grip" instead of a "takedown" is not appropriate under the circumstances because Plaintiff was running.  Trial Tr., Vl. 3 at 228:25-229:13; Trial Tr., Vl. 5, at 47:23-25; 67:12-24; 68:2-20.

testimony to that of Officer Venzon, the Court finds that Plaintiff was prejudiced by defense counsel's violation of the Court's sequestration order.

### b.      Closing Argument

Plaintiff contends that defense counsel "saved his most prejudicial violations of Court Orders for his closing statement." Pl.'s Mtn. at 16. Specifically, Plaintiff argues that defense counsel: (1) made improper appeals to the passion and prejudice of the jury; (2) argued to the jury that a collateral source paid for Plaintiff's medical bills in violation of a Court order; and (3) introduced excluded opinion testimony from Dr. Mills regarding the cause of Plaintiff's injuries. Id. at 16-22.

### i.      Improper Appeals to the Passion and Prejudice of the Jury

Plaintiff argues that defense counsel made improper appeals to the passion and prejudice of the jury by characterizing Plaintiff as a drug user and a criminal. Pl.'s Mtn. at 16-17. While Plaintiff cites to several statements made by defense counsel during his closing argument regarding Plaintiff's drug use and the fact that he was committing a crime when Officer Venzon chased him down and tackled him, Plaintiff has failed to show that the statements lacked any factual basis in the evidence adduced at trial or that the statements were unreasonable inferences from the evidence in the record. As such, Plaintiff has not shown that defense counsel's conduct in this regard constitutes misconduct.

### ii.      Collateral Source Rule

Plaintiff contends that defense counsel violated the Court order precluding any evidence or argument offered to show that a collateral source paid for Plaintiff's medical bills. Pl.'s Mtn. at 17. During Defendant's closing statement, defense counsel discussed Plaintiff's entitlement to damages. As part of this discussion and just prior to concluding his remarks to the jury, defense counsel told the jury that in evaluating Plaintiff's damages they should consider that "there's been no testimony that Mr. Woodard paid a dime out of his pocket for anything. He didn't testify to that. There has been no receipts of money that

1  he paid.  In fact, if you look at Exhibit 10, the last page, which is the summary of bills, it

2  says: 'You pay this: zero.' "  Trial Tr., Vl. 5 at 203:2-6.

3        After defense counsel finished his closing statement, the Court admonished him

4  during a sidebar for violating a Court order, stating that the parties and the Court had a

5  discussion about this issue and the Court ruled that Defendant cannot argue that Plaintiff is

6  not legally entitled to the value of the medical services rendered because he did not pay for

7  the services.  See Trial Tr., Vl. 5 at 204:20-207-4.  In doing so, the Court stated that it was

8  "really a little disconcerted about these repeated what appears to be ignoring of the Court's

9  orders."  Id. at 207:16-17.  The Court subsequently instructed the jury to disregard defense

10  counsel's statement and to consider the value of the medical services rendered to Plaintiff,

11  not whether Plaintiff had the money to pay for it [himself]."  Id. at 207:22-208:3.  The

12  Court also instructed the jury that they may consider all of the evidence in the case to

13  determine the value of the medical services rendered, and that the amount Plaintiff paid is

14  not necessarily indicative of the value of the medical care and treatment he received.  Id. at

15  208:4-9.

16        Given the lengthy discussions the Court had with the parties regarding the

17  application of the collateral source rule to this case, including a discussion shortly before

18  closing arguments,[11] the Court finds that defense counsel's violation of the Court's order

19  regarding collateral source evidence in his closing argument was a deliberate strategy to

20  place prejudicial evidence before the jury.  It has long been recognized that evidence of

21  collateral source benefits "involves a substantial likelihood of prejudicial impact."  See

22  Eichel v. N.Y. Cent. R.R. Co., 375 U.S. 253, 255, 84 (1963) (per curiam); see Brooks v.

23  Cook, 938 F.2d 1048, 1052 (9th Cir. 1991) (evidence showing the receipt of funds by a

24

_____

25  [11] During the settling of the jury instructions, defense counsel raised a question with respect to the jointly proposed damage instruction; specifically, counsel stated that there

26  has been no testimony that Plaintiff has "incurred any damages with respect to medical care in terms of paying for medical care."  Trial Tr., Vl. 4 at 24:13-25:14.  In response, the Court

27  stated that defense counsel had failed to provide legal argument in support of his position that the jury cannot consider evidence of the amount of the value of his medical care

28  because Plaintiff did not personally pay for it.  See id. at 26:12-27:4.

plaintiff from a third party such as insurance payments involves a substantial likelihood of prejudicial impact); Brown v. Royalty, 535 F.2d 1024, 1028 (8th Cir. 1976) ("It is generally considered that the interjection by the defense that a plaintiff has recovered a portion of his economic loss resulting from an accident because of payments by a collateral source is prejudicial and may be grounds for a mistrial.").

By telling the jury that Plaintiff had not paid a "dime out of his pocket for anything" and directing them to a portion of Plaintiff's medical bills stating that Plaintiff did not owe any money, defense counsel sought to demonstrate that Plaintiff had not incurred any medical expenses.  This statement was designed to lead the jury to conclude that Plaintiff's medical expenses were paid for by a collateral source.  Reference to the amount of collateral source payments a plaintiff has received is as violative of the collateral source rule as reference to the source of payment.  See Sheehy v. S. Pac. Transp. Co., 631 F.2d 649, 653 (9th Cir. 1980) ("The pitfalls [of admitting collateral source benefits] are not avoided by permitting evidence of the amount but not the source of such collateral benefits.").

To the extent Officer Venzon argues that Plaintiff suffered no prejudice from defense counsel's closing statement because Plaintiff "opened the door" to the introduction of collateral source evidence by submitting to the jury a bill that read: "PAY THIS AMOUNT $0," Def.'s Opp. at 19, the Court rejects this argument.  Officer Venzon failed to provide any authority or legal analysis demonstrating that it was proper for defense counsel to violate the Court's order excluding collateral source evidence.  Indeed, Officer Venzon's opposition lacks any legal analysis as to why the authority he relies upon supports the conclusion that it was appropriate for his counsel to tell the jury that Plaintiff did not pay for his medical bills.  A review of the cases cited by Officer Venzon reveal that they are distinguishable from the present circumstances and do not support Officer Venzon's position.

In addition, without citation to authority or legal analysis, Officer Venzon also argues that there is no prejudice from defense counsel's closing statement because Plaintiff

1  confirmed during his testimony that he suffered no financial losses, Plaintiff only sought

2  pain and suffering damages, defense counsel did not introduce evidence as to the value of

3  the services received by Plaintiff, the Court gave a curing instruction, and the jury

4  instructions on damages clearly instructed the jury to award the value of reasonable

5  services.  Def.'s Opp. at 19-20.  Finally, Officer Venzon argues that, even if the jury

6  miscalculated damages, a retrial on damages is unnecessary since the jury did not find

7  liability.  Id. at 20.

8      Officer Venzon's conclusory arguments are meritless.  The fact that Plaintiff is only

9  seeking damages for pain and suffering demonstrates that defense counsel had no reason to

10 elicit testimony from Plaintiff concerning medical expenses.  Despite being aware that

11 Plaintiff was not seeking damages for medical expenses, defense counsel nonetheless

12 deliberately elicited testimony from Plaintiff about whether he suffered any "financial

13 losses" as a result of the incident.  Trial Tr., Vl. 2 at 124:15-24.  By eliciting testimony

14 from Plaintiff that he had not incurred any losses as a result of the incident giving rise to

15 this suit, defense counsel implied that Plaintiff's medical expenses were paid by a collateral

16 source.

17     As for Officer Venzon's argument that a retrial is not necessary because the jury did

18 not find him liable, the Court rejects this argument.  Courts have recognized that the

19 prejudice resulting from collateral source evidence may impact both a jury's liability and

20 damage determinations.  Tipton v. Socony Mobil Oil Co., 375 U.S. 34, 37 (1963) ("We

21 disagree with the suggestion . . . that the prejudicial effect of the evidence of other

22 compensation would be restricted to the issue of damages and would not affect the

23 determination of liability."); Green v. Denver & Rio Grande W. R.R. Co., 59 F.3d 1029,

24 1032 (10th Cir. 1995) ("The major reason for excluding collateral source evidence is the

25 concern that juries will be more likely to find no liability if they know that plaintiff has

26 received some compensation."); Sheehy, 631 F.2d at 651-652 ("Courts have consistently

27 interpreted Eichel to preclude admission of evidence of collateral benefits whether such

28 evidence is presented during the liability or damages phase of the trial.").

1    In this case, defense counsel made an implicit reference to collateral source evidence

2    by eliciting testimony from Plaintiff that he did not suffer any "financial losses" from the

3    incident.  During closing arguments, defense counsel emphasized that a collateral source

4    paid Plaintiff's medical bills by stating that "there's been no testimony that [Plaintiff] paid a

5    dime out of his pocket for anything.  He didn't testify to that.  There has been no receipts of

6    money that he paid.  In fact, if you look at Exhibit 10, the last page, which is the summary

7    of bills, it says: 'You pay this: zero.' "  Trial Transcript, Vl. 5 at 203:2-6.  While the Court

8    gave a curing instruction after defense counsel flagrantly violated the Court's order, and

9    instructed the jury regarding damages prior to deliberations, the Court finds that these

10    instructions were insufficient to mitigate the prejudice to Plaintiff from defense counsel's

11    willful circumvention of the Court's order.  Given the deliberate nature of defense counsel's

12    conduct, the Court concludes that a strong probability exists that the verdict was unfairly

13    influenced by defense counsel's improper conduct.  Moreover, the Court finds that any

14    doubt about the effectiveness of the curative instructions should be resolved in favor of

15    Plaintiff.

16              **iii.    Introduction of Excluded Expert Testimony**

17    Plaintiff contends that defense counsel improperly attempted to elicit excluded

18    testimony from its medical expert Dr. Mills, and introduced the excluded opinion of Dr.

19    Mills in his closing argument as maxims of common sense rather than the opinion of Dr.

20    Mills.  Pl.'s Mtn. at 19-21.  Prior to trial, the Court granted Plaintiff's motion *in limine* no. 7,

21    ruling that while Dr. Mills may offer an opinion as to his diagnosis of Plaintiff's rib injuries,

22    he is precluded from offering any opinion as to the cause of Plaintiff's injuries, including

23    the cause of his rib injuries.  Dkt. 169.  As such, Dr. Mills was precluded from testifying

24    that Plaintiff's injuries were caused by a "single event" and not from "multiple blows" as

25    indicated in his expert report.  Id.

26    During the direct examination of Dr. Mills, defense counsel attempted to elicit an

27    opinion outside the scope of Dr. Mills' expertise.  Dr. Mills was received by the Court as an

28    expert qualified to render expert opinions in the area of diagnosis and treatment of skeletal

injuries.  Trial Tr., Vl. 3 at 19-23.  Despite the fact that the Court denied defense counsel's request to designate Dr. Mills as an expert in additional areas, id. at 117:15-118:19, defense counsel asked Dr. Mills whether Plaintiff's ribs perforated his lung.  Id. at 152:1-2.  In response to this question, the expert attempted to explain what caused the injury to Plaintiff's lung.  Id. at 152:3-6.  The Court stopped the expert from answering, reminding defense counsel that this witness was not in a position to testify as to what caused the injury to the lung.  Id. at 152:7-12.  While it is clear that defense counsel improperly attempted to elicit testimony from Dr. Mills in violation of a Court order, Dr. Mills did not provide any testimony regarding what caused the injury to Plaintiff's lung.  As such, Plaintiff was not prejudiced by defense counsel's improper conduct in this regard.

To the extent Plaintiff argues that defense counsel introduced Dr. Mills' excluded opinion on causation during his closing argument, the Court finds that the portions of the record cited by Plaintiff do not support his contention.  Plaintiff has not shown that defense counsel's arguments in this regard went beyond the evidence in the record and reasonable inferences that could be drawn from that evidence.  Defense counsel did not argue that Dr. Mills testified that Plaintiff's injuries were caused by a single blow.  Rather, counsel argued that Plaintiff's multiple blow theory does not make sense given the nature of the rib fractures.  As pointed out by defense counsel, there was evidence in the record showing that the rib fractures were aligned, i.e., in a "direct line."[12]  See Trial Tr., Vl. 3 at 131:12-132:21.  Thus, there was evidence in the record that arguably did not support Plaintiff's contention that his injuries were the result of multiple blows.

### c.      Remaining Issues

In addition to arguing that defense counsel engaged in misconduct by violating Court orders, Plaintiff contends that defense counsel engaged in the following misconduct: (1) defense counsel made improper testimonials as to his own opinions, experiences, and credibility; (2) defense counsel introduced improper legal instruction; and (3) defense

---

[12] See Trial Tr., Vl. 3 at 230:23-25 (Plaintiff's medical expert testified that Plaintiff's ribs were cracked "along a similar line.").

counsel made improper appeals to the passion, prejudice and sympathy of the jury.  Pl.'s Mtn. at 13-16.  These arguments are discussed in turn below.

### i.      Defense Counsel's Improper Testimonials

Plaintiff contends that defense counsel engaged in misconduct by injecting his own assessment of the evidence into the record, including his assessment of the credibility of Dr. Fullerton.  Pl.'s Mtn. at 13-14.  Specifically, Plaintiff argues that the following statement by defense counsel was improper:  "I think you can discount Dr. Fullerton's testimony with regards to the cause of the injuries because it doesn't -- it doesn't comply or it doesn't coincide with what the medical records show and doesn't coincide with what the x-ray[s] show."  Id. at 13 (citing Trial Transcript, Vl. 5 at 200:8-11).  In addition, Plaintiff argues that it was improper for defense counsel to state in his closing argument that he "tend[s] to think that the medical report, which occurred an hour after the incident, is a better judge of [Plaintiff's] physical condition than anything else."  Pl.'s Mtn. at 13 (citing Trial Tr., Vl. 5 at 199:9-12).  Finally, Plaintiff argues that it was improper for defense counsel to bolster Officer Venzon's failure to remember whether he had asked Plaintiff if he was hurt, by asserting: "[w]e all do things every day as just a common occurrence that we do.  I close the garage door, I drive away and then I wonder half a block away, did I close it, because I don't consciously remember doing something.  I know I close it every day, just as Officer Venzon would know that this is something he asks somebody)."  Pl.'s Mtn. 13-14 (citing Trial Tr., Vl. 5 at 199:22-200:2).

Although it was improper for defense counsel to inject his personal opinions into the proceedings to bolster the evidence, the Court finds that Plaintiff has failed to demonstrate that defense counsel's remarks in this regard were of such a nature and frequency that, standing alone, they had a prejudicial impact on the jury's verdict.  An examination of the cases relied upon by Plaintiff to establish prejudicial impact are clearly distinguishable from the present circumstances insofar as those case involved repeated and egregious improper remarks by counsel.  See Draper v. Airco, Inc., 580 F.2d 91 (3d Cir. 1978); Fineman v. Armstrong World Indus., Inc., 980 F.2d 171 (3d Cir. 1992).

1

**ii.      Introduction of Improper Legal Instruction**

2          Plaintiff contends that defense counsel's improper introduction of legal instruction

3    on two occasions warrants a new trial.  Pl.'s Mtn. at 14.  First, Plaintiff argues that defense

4    counsel attempted to improperly introduce an interpretation of the reasonableness standard

5    that governs in excessive use of force cases.  Id.  A review of the record reveals that

6    defense counsel invoked the Supreme Court case Graham during his closing argument to

7    argue that the jury should not evaluate the force used by Officer Venzon with 20/20

8    hindsight, but rather from "the eyes of [Officer Venzon] at the moment it happened;" noting

9    that there is "no Monday morning quarterbacking."  Trial Tr., Vl. 5 at 201:16-21.  The

10   Court responded by advising the jury that they are to follow the legal authority that they

11   receive from the Court, not defense counsel's interpretation of a case, which may or may

12   not be correct.  Id. at 201:22-25.  Thus, as noted by the Court during trial, defense counsel's

13   argument was clearly improper.  See Hangarter v. Provident Life and Acc. Ins. Co., 373

14   F.3d 998, 1016 (9th Cir. 2004) (instructing the jury as to the applicable law "is the distinct

15   and exclusive province" of the court).  However, given the Court's curative statement, any

16   prejudice suffered by Plaintiff was likely mitigated.

17         Second, Plaintiff contends that defense counsel encouraged improper legal

18   instruction from Officer Venzon's expert in police procedures, tactics and use of force.  Pl.'s

19   Mtn. at 14.  On direct examination of Sergeant Katapodis, defense counsel asked the

20   witness whether he believed that Officer Venzon complied with the standards articulated by

21   the Supreme Court in Graham.  Trial Tr. Vl. 5 at 73:23-74:7.  In response, the expert stated:

22   "Absolutely, I believe the force that [Officer Venzon] used was objectively reasonable. . . ."

23   Id. at 74:8-9.  As a consequence, the Court instructed the jury that Sergeant Katapodis is

24   not a legal expert, and that they are to disregard any suggestion that he is testifying

25   concerning the legal import of any case.  Id. at 74:10-16.

26         The Court finds that defense counsel willfully engaged in misconduct by

27   deliberately eliciting an inadmissible legal opinion from Sergeant Katapodis on the ultimate

28   issue to be decided by the jury - whether Officer Venzon's use of force was reasonable.  It

is well settled that an expert witness cannot give an opinion on an ultimate issue of law. Hangarter v. Provident Life and Acc. Ins. Co., 373 F.3d 998, 1016 (9th Cir. 2004). Although the Court gave a curative instruction to the jury regarding the inappropriate testimony elicited by defense counsel, the Court finds that a strong probability exists that the jury verdict was unfairly influenced by defense counsel's improper conduct.  Moreover, the Court finds that any doubt about the effectiveness of the curative instruction should be resolved in favor of Plaintiff in light of defense counsel's deliberate transgression of a well settled rule of law.

### iii.    Improper Appeals to the Passion, Prejudice and Sympathy of the Jury

Plaintiff contends that a new trial is warranted because defense counsel elicited testimony about Officer Venzon's children to induce the jury's sympathy and to make them reluctant to award damages.  Pl.'s Mtn. at 15.  In addition, Plaintiff contends that defense counsel mischaracterized Plaintiff's mental disorder to prejudice the jury against Plaintiff because he suffers from a mental disorder.  Id. at 15-16.

As for Officer Venzon's testimony that he has three kids,[13] the Court finds that such testimony is irrelevant and that defense counsel intentionally elicited such information for the purpose of garnering sympathy from the jury.  However, Plaintiff has not demonstrated that the bare mention of this fact, standing alone, justifies a new trial.

As for Plaintiff's contention that defense counsel mischaracterized Plaintiff's mental disorder for an improper purpose, the Court finds that Plaintiff has failed to show that defense counsel's remarks during his closing argument were improper or otherwise resulted in a verdict based on passion and prejudice.  Plaintiff asserts that the following statement made by defense counsel during closing argument was improper:

> Dr. Fullerton further testified that some of the side effects of schizophrenic paranoia is you are afraid that people are going to kill you.  Just like [Plaintiff] said, he was afraid people were going to kill him.  That is, the disease can cause hallucinations, it can cause delusions.  It can cause someone to unreasonably fear things.

---

[13] See Trial Tr., Vl. 3 at 213:12-17.

Trial Tr., Vl. 5 at 190:10-15.

A review of the record reveals that defense counsel's remarks are based on evidence in the record and reasonable inferences drawn from that evidence. It is undisputed that Plaintiff suffers from paranoid schizophrenia. Trial Tr., Vl. 2 at 215:12-17. Further, Dr. Fullerton testified that the side effects of Plaintiff's condition include hallucinations, delusions, and exaggerated fears. Id. at 216:2-17; 216:24-217:15. While Dr. Fullerton also testified that the fear and paranoia associated with Plaintiff's condition can be treated with medication, he stated that Plaintiff was not taking his medications for his condition all the time. Id. at 216:24-217:4; 220:16-221:1. In addition, Plaintiff testified that when he initially encountered the officers he thought they were going to murder or rob him. Id. at 105:20-106:2.

### d.      Conclusion

In sum, the Court finds that defense counsel's pervasive misconduct in the form of repeatedly violating Court rulings substantially interfered with the Plaintiff's interest such that a new trial is warranted to prevent a miscarriage of justice. Cumulatively, defense counsel's improper conduct permeated the proceeding to such an extent that the Court is persuaded that the jury was sufficiently prejudiced to warrant a new trial. On numerous occasions during trial, defense counsel flagrantly violated the Court's rulings, despite being repeatedly admonished to adhere to such rulings.

On several occasions, defense counsel presented to the jury prejudicial testimony and/or argument on subjects which the Court had expressly ruled to be inadmissible. Defense counsel also willfully violated the Court's sequestration order, which substantially prejudiced Plaintiff, as this case hinged largely upon the jury's assessment of the credibility of the witnesses who testified. The prejudicial effect of defense counsel's conduct cannot be disputed. The Court is convinced that each and every instance of improper conduct by defense counsel was deliberate and calculated and inured to the benefit of their client. Defense counsel's attempt to excuse their improper conduct by claiming that they

misunderstood the Court's orders, did not remember the orders, or by pointing out that Plaintiff's counsel also violated the sequestration order is unpersuasive and does not alter the overall prejudicial impact that such conduct had on the proceedings.

Under the totality of circumstances, the Court finds that the cumulative impact of defense counsel's improper conduct from opening statements to closing arguments necessarily prejudiced Plaintiff.[14]  In assessing its impact from the inception of the trial to its end, the result of such conduct was an unfairly influenced jury verdict.  Defense counsel's improper conduct so permeated the proceedings that Plaintiff's objections and the Court's curative instructions were insufficient to avoid a tainted jury verdict.  The persistent nature and "flavor" of the improper conduct rendered the Court's curative instructions ineffective in neutralizing the prejudice caused by such conduct.  In short, considering the nature of defense counsel's conduct, its frequency, its relevancy to the issues before the jury, and the strength of Plaintiff's case, the Court concludes that a new trial is warranted to prevent a miscarriage of justice.  Accordingly, Plaintiff's motion for a new trial is GRANTED.

### 2.    Whether the Jury Verdict is Contrary to the Weight of the Evidence

In light of the Court's determination that a new trial is warranted based on attorney misconduct, the Court will not reach Plaintiff's alternative ground for a new trial.  Specifically, the Court will not address Plaintiff's contention that a new trial is warranted because the jury verdict is contrary to the clear weight of the evidence.

### IV.    CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT:

1.    Plaintiff's renewed motion for judgment as a matter of law is DENIED.

2.    Plaintiff's motion for a new trial is GRANTED.

---

[14] While the Court found that some of the improper conduct defense counsel engaged in did not rise to the level of prejudicial misconduct in and of itself, that does not alter the fact that defense counsel's improper conduct so permeated the proceedings to a point that the Court is convinced that the cumulative effect of such conduct prejudiced Plaintiff and unfairly influenced the jury's verdict.

1      3.      A Case Management Conference is scheduled for **November 14, 2012 at**

2  **3:00 p.m.**  Prior to the date scheduled for the conference, the parties shall meet and confer

3  and prepare a joint Case Management Conference Statement.  Plaintiff is responsible for

4  filing the joint statement no less than seven (7) days prior to the conference date.  The joint

5  statement shall comply with the Standing Order for All Judges of the Northern District of

6  California and the Standing Orders of this Court.  Plaintiff is responsible for setting up the

7  conference call, and on the specified date and time, shall call (510) 637-3559 with all

8  parties on the line.

9      IT IS SO ORDERED.

10  Dated:  September 30, 2013

11  
_____
SAUNDRA BROWN ARMSTRONG
12  United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28